1   JOHN J. FRANKOVICH (NSBN 667)
    MIRANDA DU (NSBN 5288)
2   MCDONALD CARANO WILSON LLP
    100 West Liberty Street, 10th Floor
3   Reno, Nevada  89505-2670
    Telephone:  (775) 788-2000
4   Facsimile:  (775) 788-2020
    E-Mail: jfrankovich@mcdonaldcarano.com
5   and mdu@mcdonaldcarano.com

6   CEDRIC C. CHAO (CA SBN 76045)
    WILLIAM L. STERN (CA SBN 96105)
7   JAMES M. SCHURZ (CA SBN 145874)
    MORRISON & FOERSTER LLP
8   425 Market Street
    San Francisco, California  94105-2482
9   Telephone:  (415) 268-7000
    Facsimile:  (415) 268-7522
10  E-Mail: cchao@mofo.com
    and wstern@mofo.com
11  and JSchurz@mofo.com

12  [Additional Counsel on Signature Page]

13  Attorneys for Plaintiff QUIXTAR INC.

14

15                UNITED STATES DISTRICT COURT

16                      DISTRICT OF NEVADA

17

18  QUIXTAR INC.,                         Case No.      3:07-cv-00505

19                 Plaintiff,             **PLAINTIFF QUIXTAR INC.'S**
                                          **OPPOSITION TO DEFENDANT SKY**
20         v.                             **SCOPE TEAM, INC.'S MOTION**
                                          **FOR SUMMARY JUDGMENT**
21  SIGNATURE MANAGEMENT TEAM, LLC
    d/b/a TEAM, and SKY SCOPE TEAM, INC.,  **REDACTED**
22
                   Defendants.
23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

I.   INTRODUCTION ...................................................................................................... 1

II.  STATEMENT OF MATERIAL FACTS WHICH PRECLUDE ENTRY OF
     SUMMARY JUDGMENT ......................................................................................... 4

     A.   TEAM's Leaders Are Terminated as Quixtar IBOs ........................................ 4

     B.   The Michigan Court Enjoins Woodward and Brady from Disparaging
          Quixtar and Soliciting Its IBOs ...................................................................... 5

     C.   Quixtar Moves to Have Woodward, Brady and TEAM Held in Contempt
          of the TRO ...................................................................................................... 5

     D.   Sky Scope Enables the Group to Evade the TRO and Preliminary
          Injunction ....................................................................................................... 6

III. SUMMARY JUDGMENT STANDARD ................................................................. 8

IV.  ARGUMENT ............................................................................................................ 9

     A.   To Survive Summary Judgment, Quixtar Need Only Show Circumstantial
          Evidence from Which a Jury Could Conclude that Sky Scope Agreed to the
          Conspiracy ...................................................................................................... 9

     B.   Sky Scope's Deference to Mr. Woodward's Instructions Is Strong
          Circumstantial Evidence That Sky Scope Conspired to Shield His
          Involvement in TEAM ................................................................................... 11

          1.   The Testimony of Sky Scope's Officers and Shareholders
               Establishes That They Willingly Complied with Direction from
               Orrin Woodward and Thus Conspired with Him. ................................... 12

               a.   Testimony of TEAM Round Table Member and Sky Scope
                    "President" Donald Freeze. ........................................................ 12

               b.   Testimony of TEAM Round Table Member Jeff Granger .......... 14

               c.   Testimony of TEAM Round Table Member John Morgan. ....... 15

               d.   Testimony of TEAM Policy Council Member George
                    Guzzardo ..................................................................................... 16

               e.   Testimony of TEAM Round Table Member Joseph
                    McGuire. ...................................................................................... 17

          2.   Mr. Woodward's Unrestricted Stock Options in Sky Scope
               Constitute an Ownership Interest. ......................................................... 18

V.   CONCLUSION ....................................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ...................................................................................... 8

Consol. Generator-Nev., Inc. v. Cummins Engine Co.,
114 Nev. 1304, 971 P.2d 1251 (1998) ......................................................... 9

Gilbrook v. City of Westminster,
177 F.3d 839 (9th Cir. 1999)............................................................. 1, 3, 10

In re Nw. Airlines Corp. Antitrust Litig.,
208 F.R.D. 174 (E.D. Mich. 2002) ......................................................... 1, 19

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) ...................................................................................... 8

Mendocino Envtl. Ctr. v. Mendocino Cnty,
192 F.3d 1283 (9th Cir. 1999)............................................................ passim

Robinson v. Twp. of Waterford,
883 F.2d 75, 1989 WL 94569 (6th Cir. Aug. 18, 1989).......................... 2, 10

Spadafore v. Gardner,
330 F.3d 849 (6th Cir. 2003).................................................................. 9, 10

Temborius v. Slatkin,
157 Mich. App. 587, 403 N.W.2d 821, 827-28 (1986)........................... 10, 18

United Steelworkers of Am. v. Phelps Dodge Corp.,
865 F.2d 1539 (9th Cir. 1989)...................................................................... 9

OTHER AUTHORITIES

Fed. R. Civ. P.
Rule 56(c) .................................................................................................... 8

D. Nev. L.R.
Rule 56-1 ...................................................................................................... 1

MCR
Rule 3.310(C)(4) ......................................................................................... 5

1    Plaintiff Quixtar Inc. ("Quixtar") opposes defendant Sky Scope Team, Inc.'s ("Sky

2 Scope") Motion for Summary Judgment, Dkt. No. 553.[1]

3 **I.  INTRODUCTION**

4    Sky Scope argues that it is entitled to summary judgment because there is no evidence of

5 it directly committing any of the tortious acts alleged in the First Amended Complaint ("FAC"),

6 and it is not liable either as the owner of defendant Signature Management TEAM, LLC

7 ("TEAM") or under an agency theory. But Sky Scope ignores the alternative basis for liability:

8 that Sky Scope "agreed upon and entered into a conspiracy" with TEAM, its co-founder Orrin

9 Woodward, and other TEAM leaders to harm Quixtar and destroy its business. (FAC, ¶ 102.) To

10 prove conspiracy, Quixtar need only show that Sky Scope "reached a unity of purpose or a

11 common design and understanding, or a meeting of the minds in an unlawful arrangement," with

12 other members. *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (internal

13 citation omitted); *In re Nw. Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174, 199 (E.D. Mich.

14 2002) (evaluating antitrust conspiracy claim). Sky Scope's motion turns on a narrow issue: if

15 there are any disputed facts from which a jury could conclude that Sky Scope conspired with

16 TEAM, Orrin Woodward, and other TEAM leaders, then Sky Scope's motion must be denied.

17    Here, the evidence shows that Sky Scope played a key role in TEAM's conspiracy to raid

18 Quixtar's Independent Business Owner distributors ("IBOs") and misappropriate its trade secrets

19 during the second half of 2007 and early 2008. At the very least, the evidence shows that there is

20 a factual dispute over Sky Scope's involvement. The Ninth Circuit has recognized that questions

21 involving state of mind, such as whether a person agreed to join a conspiracy, "are generally

22 factual issues inappropriate for resolution by summary judgment." *Mendocino Envtl. Ctr. v.*

23 *Mendocino Cnty*, 192 F.3d 1283, 1302 (9th Cir. 1999) (internal citation omitted). The Sixth

24 Circuit has similarly held that for summary judgment purposes, "the question whether an

25

26    [1] Pursuant to Local Rule 56-1, Quixtar provides detailed responses to Sky Scope's
separate concise statement of facts in a chart attached as Ex. A. Those responses, and the facts set

27 forth in this Opposition, demonstrate that there are genuine issues of material disputed fact which
preclude summary judgment.

28

1   agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a

2   possibility that the jury can infer from the circumstances [that the alleged conspirators] had a

3   meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives."

4   *Robinson v. Twp. of Waterford*, 883 F.2d 75, 1989 WL 94569, at *7 (6th Cir. Aug. 18, 1989)

5   (internal citations omitted).  The factual dispute regarding Sky Scope's role in the conspiracy

6   precludes summary judgment.

7       Sky Scope became a necessary co-conspirator with Mr. Woodward, TEAM, and other

8   TEAM leaders because in August 2007, a Michigan state court issued an injunction expressly

9   prohibiting Mr. Woodward from engaging in conduct directly at issue in this case, *i.e.*,

10   disparaging Quixtar, misappropriating its trade secrets, and soliciting its IBOs.  Under Michigan

11   law, the injunction also enjoined anyone acting in concert with Mr. Woodward from committing

12   those acts.  Mr. Woodward therefore was precluded from openly directing TEAM, the company

13   he managed, in carrying out TEAM's raid on Quixtar's IBOs without risking that the Michigan

14   court would find him and/or TEAM in violation of the injunction.  In response to the injunction,

15   Mr. Woodward was forced to resign as manager of TEAM.

16       Sky Scope provided the means by which Mr. Woodward could, together with TEAM, its

17   leaders, profit sharers and senior management, still help direct the campaign against Quixtar.

18   Mr. Woodward had previously set up six Nevada C corporations to jointly own 100% of TEAM.[2]

19   Mr. Woodward then set up a small group of his closest allies, all of whom were top-level profit

20   sharers in TEAM or within senior management of TEAM, as the sole shareholders of Sky Scope.

21   These shareholders constituted Mr. Woodward's "inner circle" and some of the key members in

22   TEAM's conspiracy to harm Quixtar.  Importantly, at the time the stock was issued, the new

23   shareholders executed Stock Option Agreements with Mr. Woodward that *granted*

24   *Mr. Woodward an unrestricted option to purchase all shares of Sky Scope* for the nominal price

25

26   [2]  In February 2008, the other five C corporations (Apollo Works Holdings, Inc.; Green

27   Gemini Enterprises, Inc.; North Star Solutions, Inc.; Northern Lights Services, Inc.; and Sunset
     Resources, Inc.) merged into Sky Scope.  Unless otherwise indicated, all references to "Sky

28   Scope" include the five companies that merged into it.

of $1.00 a share. In effect, the structure of Sky Scope ensured Mr. Woodward would retain

ownership of TEAM and remain involved in TEAM and its operations while nominally TEAM

was owned and operated by others. Mr. Woodward could resign his official position as TEAM's

manager and thereby persuade the Michigan court that he was no longer directing the company,

while he continued to own TEAM and participate in TEAM's anti-Quixtar campaign.

As the deposition testimony of the former shareholders shows, the original shareholders of

Sky Scope, including its president and director, were stand-ins for Mr. Woodward. They did not

pay anything of value to obtain their shares in the company, did not receive any dividends or

other compensation as shareholders, and did not receive anything of value when they handed over

their shares to Mr. Woodward in February 2008. Their reward for their participation in Sky

Scope was their continued participation as profit sharers within TEAM, Policy Council members,

and senior management. This reward was significant. As the Michigan court found, Policy

Council members earned between $1 million and $10 million annually from TEAM, and the

Round Table members were among TEAM's top profit sharers. (Affidavit of James M. Schurz

("Schurz Aff."), Ex. 1 (Nov. 8, 2007 J. Sullivan Order) at 9.)[3]

Collectively, the evidence shows that Sky Scope "reached a unity of purpose or a common

design and understanding" with Orrin Woodward, senior managers within TEAM, TEAM Policy

Council members, and leading profit sharers to pursue their collective campaign to raid Quixtar's

IBOs, disparage Quixtar, and misappropriate Quixtar's trade secrets. *Gilbrook*, 177 F.3d at 856.

The fact that Mr. Woodward abruptly stepped down as manager of TEAM at a time when he

needed the company to further TEAM's anti-Quixtar campaign, coupled with proof of Sky

Scope's leaders' acquiescence in his instructions and Sky Scope's ability to provide cover, is

strong evidence that Sky Scope and its original shareholders agreed to shield Mr. Woodward's

involvement in TEAM to enable the parties to evade the Michigan injunction. Sky Scope's

motion for summary judgment should be denied.

---

[3] The Schurz Affidavit is attached to this brief as Exhibit B.

## II.   STATEMENT OF MATERIAL FACTS WHICH PRECLUDE ENTRY OF SUMMARY JUDGMENT[4]

### A.   TEAM's Leaders Are Terminated as Quixtar IBOs

In 2007, Quixtar approached TEAM's leaders, who at that time were all Quixtar IBOs, to address their serious breaches of the Quixtar Rules of Conduct. (Schurz Aff., Ex. 2 (Declaration of Gary Vander Ven) at ¶ 31.) Quixtar organized a meeting with TEAM's top leaders on August 9, 2007 to discuss a plan for remediating their misconduct. (*Id.*) Instead of working with Quixtar to resolve the issues, TEAM's leaders used the meeting to announce TEAM's intention to break off from Quixtar. (*Id.*) This plan had been in development for some time. They demanded that Quixtar waive the non-compete and non-solicitation provisions in their IBO agreements, making it clear that they intended to solicit thousands of other IBOs to leave Quixtar and join TEAM in working for a competitor. (*Id.*) Further, TEAM's leaders threatened that if Quixtar did not forfeit its rights under the IBO agreements, they would immediately launch an all-out legal and public relations campaign against Quixtar. (*Id.*)

Quixtar did not agree to waive its protections under the agreements and instead terminated the TEAM leaders' IBO contracts. (*Id.* at ¶ 32.) Within a few hours, Mr. Woodward and other TEAM leaders filed the class action lawsuit they had threatened, which turned out to be the first in a series of lawsuits by Mr. Woodward's associates targeting Quixtar in state and federal courts all over the country. (*Id.*; *see also* TEAM, Ex. 30.) Within days, TEAM's public relations firm unleashed TEAM's multimedia public relations assault on Quixtar, which included unveiling a website entitled "Free The IBO." (Schurz Aff., Ex. 3 (Declaration of Margaret Ross) at ¶ 3.) TEAM posted numerous false and disparaging statements about Quixtar on the Free The IBO website in an effort to convince IBO readers to leave Quixtar and join TEAM. (Schurz Aff., Ex. 4 (excerpt from Free The IBO Website.)

---

[4] A comprehensive statement of facts is included in Quixtar's Opposition to TEAM's Motion for Summary Judgment, filed July 21, 2010, which is incorporated by reference. The present statement of facts focuses on those facts pertinent to Sky Scope's motion.

**B.     The Michigan Court Enjoins Woodward and Brady from Disparaging Quixtar and Soliciting Its IBOs**

Pursuant to the arbitration provision in its IBO agreements, Quixtar filed a demand for arbitration with JAMS against Mr. Woodward, TEAM's co-founder Chris Brady, and others on August 10, 2007.  (Schurz Aff., Ex. 5 (Aug. 24, 2007 J. Sullivan Order) at 2.)  Quixtar also filed a lawsuit seeking injunctive relief in aid of arbitration in Michigan State Court, Kent County, before the Honorable Paul J. Sullivan, *Quixtar Inc. v. Woodward et al.*, No. 07-08413-CK.  (*Id.*)

On August 10, Judge Sullivan entered a TRO prohibiting Woodward and Brady from, among other things, "[u]sing their Quixtar Line of Sponsorship ["LOS"] to sell, distribute, or promote competing products"; "[e]ncouraging, soliciting, or otherwise attempting to recruit or persuade any other IBO to compete with Quixtar's business"; and "[d]isparaging Quixtar, or otherwise engaging in activities injurious to the reputation of Quixtar."  (Schurz Aff., Ex. 6 (Aug. 10, 2007 J. Sullivan Order) at 2.)  Under the Michigan Rules of Court, the TRO was binding not only upon Woodward and Brady, but also upon "those persons in active concert or participation" with them.  MCR 3.310(C)(4).  Judge Sullivan then set a preliminary injunction hearing for August 22, 2007.  (Schurz Aff., Ex. 6, at 3.)  Ultimately, on August 24, 2007, Judge Sullivan converted the TRO into a preliminary injunction (the "Sullivan Order").  (Schurz Aff., Ex. 5.)

**C.     Quixtar Moves to Have Woodward, Brady and TEAM Held in Contempt of the TRO**

Four days after Judge Sullivan entered the August 10, 2007 TRO, Quixtar moved to have Woodward, Brady and TEAM held in contempt for violating it.  (Schurz Aff., Ex. 7 (Brief in Support of Ex Parte Motion for Order to Show Cause).)  Quixtar argued that Woodward and Brady controlled TEAM and were using TEAM to violate the TRO.  (*Id.* at 6-7.)  Specifically, Quixtar argued that TEAM had posted disparaging statements about Quixtar on the TEAM website and had used Quixtar's confidential and trade secret information to solicit its IBOs.  (*Id.* at 4-6.)  Quixtar argued that because the TRO was binding on persons acting in "active concert or

1    participation" with the enjoined parties, TEAM, Woodward, and Brady were all violating the

2    TRO. (*Id.*)[5]

3        **D.      Sky Scope Enables the Group to Evade the TRO and Preliminary Injunction**

4            Faced with the threat that the court would find TEAM in contempt of the TRO,

5    Mr. Woodward needed to be able to show that even though he was TEAM's manager, TEAM

6    was not acting "in concert" with him.  At the same time, since he was enjoined from carrying out

7    the anti-Quixtar campaign himself, he needed TEAM, its Policy Council and TEAM leaders to

8    move ahead with the group's action plan.

9            Sky Scope was the solution.  Sky Scope owned 100% of TEAM.  (Schurz Aff., Ex. 8

10   (TEAM's Second Supplemental Answers to Plaintiff's First Interrogatories (Nos. 1, 6, 8(iii)) to

11   Defendant Signature Management TEAM, L.L.C.) at 11-12.)  In turn, the people with the ability

12   to control Sky Scope, *i.e.* its president, secretary, treasurer and director, as well as all of its

13   shareholders, were leading profit sharers of TEAM and loyal followers of Mr. Woodward.  They

14   included TEAM CEO Bob Dickie, TEAM CFO Rob Hallstrand, and other members of TEAM's

15   Policy Council and Round Table leadership.  (*Id.* at 13.)  Each of the Sky Scope shareholders had

16   a financial interest in the success of TEAM and the anti-Quixtar campaign.  (*See* Schurz Aff.

17   Ex. 9 (D. Freeze Tr. 10/8/08) at 123:14-16 (Freeze was a Policy Council member); Ex. 10

18   (J. Granger Tr. 1/9/09) at 72:13-22 (Round Table member); Ex. 11 (J. Morgan Tr. 1/2/09) at 33:5-

19   10 (Round Table member); Ex. 12 (G. Guzzardo Tr. 12/30/08) at 53:15-20 (Policy Council

20   member); and Ex. 13 (J. McGuire Tr. 3/20/09) at 17:22-18:2 (Round Table Member).)  And as

21   shown below in Section IV.B.1, these Woodward loyalists willingly complied with the role they

22   were assigned in shielding Mr. Woodward's interest and participation in Sky Scope and TEAM.

23   (Ex. 9-13.)  With the acquiescence of Sky Scope's leaders, Mr. Woodward could dissociate

24   himself from TEAM on paper while retaining his control in TEAM's operations from behind the

25

26

27        [5] Quixtar withdrew its motion for contempt on August 23 and re-filed it a few weeks later,
     on September 21, 2007.  The Michigan court held a three day evidentiary hearing in October and
28   issued its ruling on November 8, 2007.  (Schurz Aff., Ex. 1.)

1   scenes. Mr. Woodward therefore abruptly resigned his position as TEAM's manager. (Schurz

2   Aff., Ex. 8 at 11.)

3        In October 2007, the Michigan court held a three day hearing on Quixtar's motion to find

4   Woodward, Brady and TEAM in contempt for violating the Sullivan Order. (Schurz Aff., Ex. 1

5   (Nov. 8, 2007 J. Sullivan Order) at 2.) It was at this hearing that Sky Scope's agreement to hide

6   Mr. Woodward's ownership interest in and control over TEAM became a critical factor in the

7   conspiracy: it enabled Mr. Woodward to testify under oath that he was not the owner of TEAM,

8   to claim that he had no legal relationship to the company, and, ultimately, to argue that TEAM

9   was not acting "in concert" with him:

10        Q. Are you still an owner in TEAM?

11        A. No.

12              . . . .

13        Q. You never owned TEAM?

14        A. Hmm-mm.

15        Q. Who did?

16        A. There were — it's an LLC, Signature Management Team is an

17        LLC and it's owned by six C-corps.

           Q. Do you own those C-corps?

18        A. No.

19        Q. Who does?

20        A. Many different individuals. I really don't — I don't know 'em

21        all.

22        Q. Do you have an ownership in any entity that has an ownership

23        interest in TEAM?

24        A. No.

25        Q. Do you know who does?

26        A. (No verbal response).

27            . . . .

28        Q. What's your current relationship with TEAM?

1    A. *Basically, I don't have any legal relationship.*  I do have,
2    obviously, a lot of friends, a lot of relationships that are built over
     the years.

3    (Schurz Aff., Ex. 14 (Tr. Oct. 16, 2007 at 9:13-13:13 (emphasis added)).)  Based on this

4    testimony, and applying the "clear and unequivocal evidence" standard that applies to motions for

5    contempt (*see* Schurz Aff., Ex. 15 (Tr. 10/17/07 at 225:14-19)), the Michigan court found that

6    Mr. Woodward was not a policy maker for TEAM and that there was no violation of the

7    injunction:

8        The Court finds particularly noteworthy the steps that both
         Mr. Orrin Woodward and TEAM took to make a good faith effort
9        to comply with the preliminary injunction.  Following his
         termination from Quixtar and the entry of the order, Mr. Woodward
10       resigned both as a manager of TEAM, as well as being a member of
         the policy council.  *These resignations removed Mr. Woodward as*
11       *an authority in a policy-making position for the organization*[.]

12   (Schurz Aff., Ex. 1 at 3 (emphasis added).)

13       In reality, however, Mr. Woodward was never removed as "an authority in a policy-

14   making position" for TEAM at all.  The testimony of Sky Scope's "authorities in a policy-making

15   position" shows that they willingly implemented Mr. Woodward's instructions.  (Schurz Aff.

16   Ex. 9-13.)  They did so because Mr. Woodward held the unrestricted right under the terms of the

17   shareholder agreements to purchase all shares of its stock for a nominal $1.00 per share.  (Schurz

18   Aff., Ex. 16 (stock option agreements).)  Mr. Woodward continued to exert control over TEAM

19   through the agreement he had reached with Sky Scope's and TEAM's leaders.

20   **III.   SUMMARY JUDGMENT STANDARD**

21       A court may not grant summary judgment unless the moving party establishes that there is

22   no genuine issue as to any material fact and that the moving party is entitled to judgment as a

23   matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The

24   court must make all justifiable inferences in the light most favorable to the nonmoving party —

25   here, Quixtar.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986).

26   Further, questions involving state of mind, such as whether a person agreed to join a conspiracy,

27   "are generally factual issues inappropriate for resolution by summary judgment."  *Mendocino*

28   *Envtl. Ctr.*, 192 F.3d at 1302 (citing *Braxton-Secret v. Robins Co.*, 769 F.2d 528, 531 (9th Cir.

1   1985)).  Even if different inferences might reasonably be drawn from the evidence, this "does not

2   justify judicial intrusion into the jury's role in determining whether a civil conspiracy existed."

3   *Id.* at 1303 (citations omitted).  Thus, so long as a finder of fact *could* conclude from the evidence

4   that Sky Scope agreed upon and entered a conspiracy with Woodward, TEAM and the others,

5   summary judgment is not appropriate.

6   **IV.    ARGUMENT**

7        The First Amended Complaint alleges that Sky Scope conspired with TEAM,

8   Mr. Woodward, and others to harm Quixtar, and that Sky Scope is therefore liable for all the

9   harm that the conspiracy caused.  Sky Scope fails to address the conspiracy allegations, let alone

10  establish that there is no genuine issue as to any material fact and that it is entitled to judgment as

11  a matter of law.  Summary judgment must be denied on that basis alone.  In any event, there is

12  strong evidence from which a jury could conclude that Sky Scope participated in the conspiracy.

13  Accordingly, Sky Scope is not entitled to summary judgment.

14       **A.    To Survive Summary Judgment, Quixtar Need Only Show Circumstantial
               Evidence from Which a Jury Could Conclude that Sky Scope Agreed to the**
15  **            Conspiracy**

16       Under Michigan law, an actionable civil conspiracy consists of "an agreement between

17  two or more persons to injure another by unlawful action." *Spadafore v. Gardner*, 330 F.3d 849,

18  854 (6th Cir. 2003) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)).[6]  It is not

19  necessary that there be an express agreement among the conspirators, and each conspirator does

20  not need to have known all of the details of the plan or all of the participants. *Id.*  Rather, "[a]ll

21  that must be shown is that there was a single plan, that the alleged coconspirator shared in the

22

23       [6] Nevada law is similar in that an actionable civil conspiracy "consists of a combination
24  of two or more persons who, by some concerted action, intend to accomplish an unlawful
     objective for the purpose of harming another, and damage results from the act or acts." *Consol.
25  Generator-Nev., Inc. v. Cummins Engine Co.*, 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (1998)
     (quoting *Hilton Hotels v. Butch Lewis Prods.*, 109 Nev. 1043, 1048, 862 P.2d 1207, 1210 (1993)).
26  Further, the plaintiff must demonstrate the existence of "an agreement or meeting of the minds"
     to accomplish the unlawful act. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d
27  1539, 1540-41 (9th Cir. 1989) (en banc) (citation omitted).  The plaintiff does *not* need to show
     that each participant in the conspiracy knew the exact details of the plan, but only that each
28  shared the common objective of the conspiracy. *See Mendocino Envtl. Ctr.*, 192 F.3d at 1301.

1   general conspiratorial objective, and that an overt act was committed in furtherance of the

2   conspiracy that caused injury to the complainant." *Id.*

3       A civil conspiracy claim may be established by circumstantial evidence. *Temborius v.*

4   *Slatkin*, 157 Mich. App. 587, 599-600, 403 N.W.2d 821, 827-28 (1986).  For summary judgment

5   purposes, "the question whether an agreement exists should not be taken from the jury in a civil

6   conspiracy case so long as there is a possibility that the jury can infer from the circumstances

7   [that the alleged conspirators] had a meeting of the minds and thus reached an understanding to

8   achieve the conspiracy's objectives." *Robinson*, 883 F.2d 75, 1989 WL 94569, at *7 (internal

9   citations omitted).[7]

10      The Complaint alleges that Sky Scope was part of a combination with Woodward, TEAM,

11  and other members of the TEAM Policy Council that used unlawful means to harm Quixtar.

12  (FAC ¶¶ 61, 102-105.)  The evidence shows that (1) at the August 9 meeting, Woodward, Brady

13  and other TEAM leaders asked Quixtar to waive its non-compete and non-solicitation obligations;

14  (2) the Michigan court enjoined Mr. Woodward and those acting in concert with him from

15  soliciting any IBOs; (3) Mr. Woodward abruptly resigned his official position as the manager of

16  TEAM; (4) Sky Scope was the sole owner of TEAM at the time; and (5) as detailed below, Sky

17  Scope's officers and shareholders implemented Mr. Woodward's instructions and objectives and

18  those of the conspiracy.

19      The conspirators memorialized their plan to raid Quixtar's IBOs in a

20  memorandum that laid out a detailed plan for █████████████████████████

21  █████████████████████████████████████████████████████████

22  ████████████████████████ (Schurz Aff., Ex. 17 (memorandum by ████████

23

24      [7] The Ninth Circuit has a similar standard - the agreement need not be overt; a
    defendant's knowledge of and participation in the conspiracy may be inferred from circumstantial
    evidence and evidence of its actions.  *Gilbrook*, 177 F.3d at 856-57; *see also Mendocino Envtl.*

25  *Ctr.*, 192 F.3d at 1302 (noting that direct evidence of an agreement "will only rarely be available"
    and that "it will almost always be necessary to infer such agreements from circumstantial

26  evidence or the existence of joint action").  "For example, a showing that the alleged conspirators
    have committed acts that 'are unlikely to have been undertaken without an agreement' may allow

27  a jury to infer the existence of a conspiracy." *Mendocino Envtl. Ctr.*, 192 F.3d at 1301 (citation
    omitted).

28

).)[8] The memorandum

. It further cautioned: "

Most importantly (in light of the Sullivan Order), the memorandum warned,

This is exactly what the conspirators did -- with the agreement of Sky Scope.

shows that Sky Scope's participation was necessary to

The evidence is sufficient to preclude summary judgment. A jury could find from these facts that Sky Scope agreed to join the conspiracy and provided the means through which its co-conspirators continued the anti-Quixtar campaign without triggering a contempt ruling. Mr. Woodward's purported act of abandoning his leadership role in TEAM was illusory and was "unlikely to have been undertaken without an agreement" with Sky Scope and TEAM to implement the objectives of the conspiracy. *Mendocino Envtl. Ctr.*, 192 F.3d at 1301 (citation omitted). Thus, even if other inferences could be drawn, summary judgment would not be appropriate here. *Id.* at 1303.

**B.    Sky Scope's Deference to Mr. Woodward's Instructions Is Strong Circumstantial Evidence That Sky Scope Conspired to Shield His Involvement in TEAM**

The evidence all points to the conclusion that even though the names of Mr. Woodward's friends were on Sky Scope's corporate documents and shares, these nominal shareholders willingly implemented whatever instructions Mr. Woodward gave them with respect to the company. This, coupled with Mr. Woodward and TEAM's leaders' need to shield

---

[8] The "████████████" memorandum is discussed in more detail in Quixtar's Opposition to TEAM's Motion for Summary Judgment, filed July 21, 2010.

1   Mr. Woodward's involvement in TEAM from the Michigan court, is strong circumstantial

2   evidence that Sky Scope agreed to participate in the conspiracy.

3             **1.**      **The Testimony of Sky Scope's Officers and Shareholders Establishes That They Willingly Complied with Direction from Orrin Woodward**

4                       **and Thus Conspired with Him.**

5                **a.**      **Testimony of TEAM Round Table Member and Sky Scope "President" Donald Freeze.**

6

7          TEAM Round Table member Donald Freeze was not only a shareholder in Sky Scope but

8   was also, according to the company's corporate documents, its president, secretary, treasurer and

9   director, from the time of its inception in 2003 until February of 2008. (Schurz Aff., Ex. 18

10  (Initial and Annual List of Sky Scope's Officers, Directors and Resident Agent from 2003

11  through 2008).)  Even though he purportedly held every position of control within the company,

12  Mr. Freeze testified that he had no role in Sky Scope's business. (Schurz Aff., Ex. 9 at 267:17-21

13  ("Q. Other than signing the paperwork for the initial incorporation of Sky Scope TEAM, Inc., did

14  you ever personally have any responsibilities, whatsoever, with regard to that entity? A. No, I

15  did not.").)  Indeed, he lacked basic knowledge about the company's business operations. (*Id.* at

16  267:25-268:3 ("Q. And to your knowledge, did Sky Scope Team, Inc. ever do any business other

17  than simply owning part of Signature Management Team, LLC? A. I, I don't know.").)  Further,

18  Mr. Freeze testified that his wife served as director of one of the other five companies that

19  merged into Sky Scope, but like Mr. Freeze, she had no substantive role in the company she

20  purportedly directed. (*Id.* at 268:25-269:11.)  From this testimony it is reasonable to infer that

21  Mr. Freeze and the officers in Sky Scope and the other companies saw their role in the companies

22  as merely a vehicle through which to implement TEAM's objectives.

23         Mr. Freeze also testified about his role as a purported shareholder of Sky Scope.  He

24  stated that the only reason he became a part owner of Sky Scope was that Mr. Woodward asked

25  him to do so:

26            Q. [H]ow did you come to have an indirect ownership stake in
          Signature Management Team, LLC?

27

28

1         A. Orrin asked me if I would be interested in, you know, representing — just owning one of the, the organizations they were putting together.

2

3         . . . .

4         Q. Did Mr. Woodward explain to you why it was he wanted you to form an entity that would own part of Signature Management TEAM, LLC?

5

6         A. Not specifically.  I think — I assumed the general strategy was, you know, like the Kennedys, they don't own anything.

7

8         . . . .

        Q. So he just asked you to do it; he didn't tell you why?

9

10         A. Correct.

        Q. And you didn't ask him?

11

12         A. No.

        Q. Did Mr. Woodward offer any incentive or inducement for you to, to do this?

13

14         A. No.

15         Q. Just asked you to do it as a favor?

16         A. Yes.

17 (*Id.* at 265:6-267:2.)  Mr. Freeze then testified that when he was asked to sign paperwork in

18 February 2008 to transfer his shares of Sky Scope to Orrin Woodward, he did not know that he

19 was doing so.  Rather, he thought that he and the other directors were resigning their "positions"

20 so as to streamline TEAM's corporate structure.  Mr. Freeze, the purported president/director of

21 Sky Scope, simply signed where he was told and did not ask any questions:

22         Q. [H]ave you ever discussed with anyone that there was going to be a document under which all of these entities that were transferred over to Orrin Woodward on February 1st, 2008, were going to be merged together and end up by owning Signature Management Team, LLC?

23

24

25         A. I was never told that.  I assumed when we signed these, taking these, the last documents to which we referred —

26         Q. Yeah.

27         A. —this, that we're not going to be doing this anymore, right?

28

1    Q. Yeah.

2    A. We resigned our positions. I assumed that there was a — you
    know, they were going to streamline the corporate structure of the
3    Team, that's all.

4 (*Id.* at 276:5-20.)  Mr. Freeze's testimony establishes that even though he was the official head of

5 Sky Scope, he had no responsibilities in connection with that role, had no knowledge of the

6 company's business (or even if it had any business), thought that he had a position, rather than

7 ownership interest, in the company, and only agreed to sign the paperwork and hold the official

8 titles as a favor to Mr. Woodward.  In other words, his entire role in Sky Scope as its president,

9 secretary, treasurer and director, as well as shareholder, was to do what TEAM and

10 Mr. Woodward asked.  This is strong circumstantial evidence that Sky Scope had a "meeting of

11 the minds" with Woodward, TEAM, and the others, to further the group's unlawful plans.

12     **b.**  **Testimony of TEAM Round Table Member Jeff Granger.**

13    TEAM Policy Council member Jeff Granger also testified that his role as a shareholder in

14 Sky Scope and the other corporations was solely to do a favor for Woodward and to further

15 TEAM's objectives.  His relationship to the companies was so limited that he did not even know

16 which companies they were:

17    Q. How is it that you didn't know which corporations you owned
    stock in?
18

19    **A. We were asked if we would be open to owning some stocks
    in some corporations that Orrin owned.  So, I said yeah, no
    problem.  So they assigned some stock to me.**
20

21    Q. Who asked you that?

22    A. Rob Hallstrand.

23    Q. Did he say why he was asking you to do that?

24    A. He — at that point, this was I don't know how many years ago,
    he had asked if it came from Orrin, you know, and it was — **he just
25    said it was just a paper thing for some of the corporations that
    he had and he wanted to put people on there that he trusted
    and asked if I would do it.  So I did.**
26

27 (Schurz Aff., Ex. 10 at 274:12-275:7 (emphasis added).)  Mr. Granger further testified that he did

28 not pay any money to acquire the stock (*id.* at 275:10-13), and that he did not receive any

1  payment of any kind in connection with his ownership of the stock, either in the form of a

2  dividend when he was a shareholder or upon transferring the stock to Mr. Woodward in February

3  2008 (*id.* at 276:2-10 and 276:18-277:4 ("I was like, yeah, no problem.  Let me get my name off

4  of there.  I don't care.  Didn't matter to me, anyway. . . . I couldn't have told you if it was one or

5  six or 20 [corporations].  I mean, there was multiple things that I signed.  I don't know what the

6  names even were on them.").)  Finally, Mr. Granger testified that he had no role in the company:

7        Q.  When you owned the stock, were you — did you have any
          responsibilities with regard to this company?
8
          A.  None whatsoever.
9

10  (*Id.* at 276:5-7.)  In short, Mr. Granger's testimony confirms that he, and inferentially, the other

11  shareholders in Sky Scope, were owners in name only, and that ultimately decision-making rested

12  with Mr. Woodward.

13                    **c.    Testimony of TEAM Round Table Member John Morgan.**

14        TEAM Round Table member John Morgan testified that beyond not having any role as a

15  purported owner of Sky Scope, he did not even know that he *was* an owner of Sky Scope and,

16  through it, TEAM:

17        Q.  Did you know that you were an owner of six Nevada
          corporations who owned TEAM?
18
          A.  No, I guess I didn't know that.
19
          Q.  Did you know that you had some sort of ownership interest in
20        TEAM?

21        A.  No.  I knew I had an officer — at least that's what I understood,
          I was an officer, but I didn't know I had any ownership in it.
22
          [ ]
23
          Q.  Until I showed this to you today did you know that you were an
24        owner of TEAM?

25        A.  No.

26            . . . .

27        Q.  You held a very significant share of the entire TEAM
          organization.
28

1    A. Huh.

2    (Schurz Aff., Ex. 11 at 139:24-144:8.)  It is unsurprising, then, that Mr. Morgan also testified that

3    he did not pay anything for his shares or receive anything when he returned his shares.  (*Id.* at

4    146:19-147:4.)  Mr. Morgan further testified that when he signed papers giving away his interest

5    in Sky Scope, he was not aware that he was doing so.  (*Id.* at 143:18-144:8.)  Finally, Mr. Morgan

6    testified that his sole role in the six corporations was to serve as Mr. Woodward's "good friend":

7    Q.  Other than signing papers that Mr. Hallstrand sent you, did you
     perform any other duties in connection with your either ownership
8    or officer role in any of these companies?

9    A.  No.

10   Q.  And other than what you've testified to with respect to what
     Mr. Woodward told you, did anyone ever explain to you the
11   purpose of these corporations?

12   A.  No.

13   . . . .

14   Q.  Did Mr. Woodward indicate in any way why he had selected
     you as someone to be involved in the Nevada corporations among
15   the many, many other people on TEAM?

16   A.  Just that he trusted me, good friend.

17   (*Id.* at 146:4-147:16.)  Mr. Morgan's testimony is further circumstantial evidence that the

18   shareholders of Sky Scope and the other entities acted in concert with Mr. Woodward and thus

19   conspired with him.

20            **d.    Testimony of TEAM Policy Council Member George
                      Guzzardo**

21       Mr. Guzzardo similarly testified that he had never heard of Sky Scope or any of the five

22   companies that merged into it.  (Schurz Aff., Ex. 12 at 212:8-213:2.)  Mr. Guzzardo then testified

23   that he did not know that he had ever owned TEAM, and he did not know if he presently had any

24   ownership of that company or of Sky Scope:

25   Q.  Do you have an ownership interest in TEAM?

26   A.  I just know there's a possibility I might have some.

27   . . . .

28

1   JOHN J. FRANKOVICH (NSBN 667)
    MIRANDA DU (NSBN 5288)
2   MCDONALD CARANO WILSON LLP
    100 West Liberty Street, 10th Floor
3   Reno, Nevada  89505-2670
    Telephone:  (775) 788-2000
4   Facsimile:  (775) 788-2020
    E-Mail: jfrankovich@mcdonaldcarano.com
5   and mdu@mcdonaldcarano.com

6   CEDRIC C. CHAO (CA SBN 76045)
    WILLIAM L. STERN (CA SBN 96105)
7   JAMES M. SCHURZ (CA SBN 145874)
    MORRISON & FOERSTER LLP
8   425 Market Street
    San Francisco, California  94105-2482
9   Telephone:  (415) 268-7000
    Facsimile:  (415) 268-7522
10  E-Mail: cchao@mofo.com
    and wstern@mofo.com
11  and JSchurz@mofo.com

12  [Additional Counsel on Signature Page]

13  Attorneys for Plaintiff QUIXTAR INC.

14

15              UNITED STATES DISTRICT COURT

16                  DISTRICT OF NEVADA

17

18  QUIXTAR INC.,                          Case No.      3:07-cv-00505

19                 Plaintiff,              **PLAINTIFF QUIXTAR INC.'S
                                           OPPOSITION TO DEFENDANT SKY
20         v.                              SCOPE TEAM, INC.'S MOTION
                                           FOR SUMMARY JUDGMENT**
21  SIGNATURE MANAGEMENT TEAM, LLC
    d/b/a TEAM, and SKY SCOPE TEAM, INC.,  **REDACTED**

22                 Defendants.

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

I.      INTRODUCTION ............................................................................................. 1

II.     STATEMENT OF MATERIAL FACTS WHICH PRECLUDE ENTRY OF
        SUMMARY JUDGMENT ............................................................................. 4

        A.      TEAM's Leaders Are Terminated as Quixtar IBOs ............................ 4

        B.      The Michigan Court Enjoins Woodward and Brady from Disparaging
                Quixtar and Soliciting Its IBOs....................................................... 5

        C.      Quixtar Moves to Have Woodward, Brady and TEAM Held in Contempt
                of the TRO ........................................................................................ 5

        D.      Sky Scope Enables the Group to Evade the TRO and Preliminary
                Injunction ......................................................................................... 6

III.    SUMMARY JUDGMENT STANDARD.......................................................... 8

IV.     ARGUMENT ..................................................................................................... 9

        A.      To Survive Summary Judgment, Quixtar Need Only Show Circumstantial
                Evidence from Which a Jury Could Conclude that Sky Scope Agreed to the
                Conspiracy ........................................................................................ 9

        B.      Sky Scope's Deference to Mr. Woodward's Instructions Is Strong
                Circumstantial Evidence That Sky Scope Conspired to Shield His
                Involvement in TEAM ........................................................................ 11

                1.      The Testimony of Sky Scope's Officers and Shareholders
                        Establishes That They Willingly Complied with Direction from
                        Orrin Woodward and Thus Conspired with Him.................... 12

                        a.      Testimony of TEAM Round Table Member and Sky Scope
                                "President" Donald Freeze................................... 12

                        b.      Testimony of TEAM Round Table Member Jeff Granger........... 14

                        c.      Testimony of TEAM Round Table Member John Morgan. ....... 15

                        d.      Testimony of TEAM Policy Council Member George
                                Guzzardo ................................................................... 16

                        e.      Testimony of TEAM Round Table Member Joseph
                                McGuire. .................................................................. 17

                2.      Mr. Woodward's Unrestricted Stock Options in Sky Scope
                        Constitute an Ownership Interest. ......................................... 18

V.      CONCLUSION.................................................................................................. 19

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................................. 8

5

*Consol. Generator-Nev., Inc. v. Cummins Engine Co.,*
    114 Nev. 1304, 971 P.2d 1251 (1998) ................................................................. 9

6

7

*Gilbrook v. City of Westminster,*
    177 F.3d 839 (9th Cir. 1999) ...................................................................... 1, 3, 10

8

9

*In re Nw. Airlines Corp. Antitrust Litig.,*
    208 F.R.D. 174 (E.D. Mich. 2002) ............................................................... 1, 19

10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ............................................................................................. 8

11

12

*Mendocino Envtl. Ctr. v. Mendocino Cnty,*
    192 F.3d 1283 (9th Cir. 1999) ................................................................... *passim*

13

14

*Robinson v. Twp. of Waterford,*
    883 F.2d 75, 1989 WL 94569 (6th Cir. Aug. 18, 1989) ............................... 2, 10

15

*Spadafore v. Gardner,*
    330 F.3d 849 (6th Cir. 2003) ........................................................................ 9, 10

16

17

*Temborius v. Slatkin,*
    157 Mich. App. 587, 403 N.W.2d 821, 827-28 (1986) .............................. 10, 18

18

19

*United Steelworkers of Am. v. Phelps Dodge Corp.,*
    865 F.2d 1539 (9th Cir. 1989) ............................................................................ 9

20

21

OTHER AUTHORITIES

22

Fed. R. Civ. P.
    Rule 56(c) ............................................................................................................ 8

23

24

D. Nev. L.R.
    Rule 56-1 ............................................................................................................. 1

25

MCR
    Rule 3.310(C)(4) ................................................................................................. 5

26

27

28

1    Plaintiff Quixtar Inc. ("Quixtar") opposes defendant Sky Scope Team, Inc.'s ("Sky

2  Scope") Motion for Summary Judgment, Dkt. No. 553.[1]

3  ## I.    INTRODUCTION

4    Sky Scope argues that it is entitled to summary judgment because there is no evidence of

5  it directly committing any of the tortious acts alleged in the First Amended Complaint ("FAC"),

6  and it is not liable either as the owner of defendant Signature Management TEAM, LLC

7  ("TEAM") or under an agency theory.  But Sky Scope ignores the alternative basis for liability:

8  that Sky Scope "agreed upon and entered into a conspiracy" with TEAM, its co-founder Orrin

9  Woodward, and other TEAM leaders to harm Quixtar and destroy its business.  (FAC, ¶ 102.)  To

10 prove conspiracy, Quixtar need only show that Sky Scope "reached a unity of purpose or a

11 common design and understanding, or a meeting of the minds in an unlawful arrangement," with

12 other members.  *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (internal

13 citation omitted); *In re Nw. Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174, 199 (E.D. Mich.

14 2002) (evaluating antitrust conspiracy claim).  Sky Scope's motion turns on a narrow issue: if

15 there are any disputed facts from which a jury could conclude that Sky Scope conspired with

16 TEAM, Orrin Woodward, and other TEAM leaders, then Sky Scope's motion must be denied.

17    Here, the evidence shows that Sky Scope played a key role in TEAM's conspiracy to raid

18 Quixtar's Independent Business Owner distributors ("IBOs") and misappropriate its trade secrets

19 during the second half of 2007 and early 2008.  At the very least, the evidence shows that there is

20 a factual dispute over Sky Scope's involvement.  The Ninth Circuit has recognized that questions

21 involving state of mind, such as whether a person agreed to join a conspiracy, "are generally

22 factual issues inappropriate for resolution by summary judgment."  *Mendocino Envtl. Ctr. v.*

23 *Mendocino Cnty*, 192 F.3d 1283, 1302 (9th Cir. 1999) (internal citation omitted).  The Sixth

24 Circuit has similarly held that for summary judgment purposes, "the question whether an

25

26    [1] Pursuant to Local Rule 56-1, Quixtar provides detailed responses to Sky Scope's
   separate concise statement of facts in a chart attached as Ex. A.  Those responses, and the facts set
27 forth in this Opposition, demonstrate that there are genuine issues of material disputed fact which
   preclude summary judgment.
28

1   agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a

2   possibility that the jury can infer from the circumstances [that the alleged conspirators] had a

3   meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives."

4   *Robinson v. Twp. of Waterford*, 883 F.2d 75, 1989 WL 94569, at *7 (6th Cir. Aug. 18, 1989)

5   (internal citations omitted).  The factual dispute regarding Sky Scope's role in the conspiracy

6   precludes summary judgment.

7          Sky Scope became a necessary co-conspirator with Mr. Woodward, TEAM, and other

8   TEAM leaders because in August 2007, a Michigan state court issued an injunction expressly

9   prohibiting Mr. Woodward from engaging in conduct directly at issue in this case, *i.e.*,

10  disparaging Quixtar, misappropriating its trade secrets, and soliciting its IBOs.  Under Michigan

11  law, the injunction also enjoined anyone acting in concert with Mr. Woodward from committing

12  those acts.  Mr. Woodward therefore was precluded from openly directing TEAM, the company

13  he managed, in carrying out TEAM's raid on Quixtar's IBOs without risking that the Michigan

14  court would find him and/or TEAM in violation of the injunction.  In response to the injunction,

15  Mr. Woodward was forced to resign as manager of TEAM.

16         Sky Scope provided the means by which Mr. Woodward could, together with TEAM, its

17  leaders, profit sharers and senior management, still help direct the campaign against Quixtar.

18  Mr. Woodward had previously set up six Nevada C corporations to jointly own 100% of TEAM.[2]

19  Mr. Woodward then set up a small group of his closest allies, all of whom were top-level profit

20  sharers in TEAM or within senior management of TEAM, as the sole shareholders of Sky Scope.

21  These shareholders constituted Mr. Woodward's "inner circle" and some of the key members in

22  TEAM's conspiracy to harm Quixtar.  Importantly, at the time the stock was issued, the new

23  shareholders executed Stock Option Agreements with Mr. Woodward that *granted*

24  *Mr. Woodward an unrestricted option to purchase all shares of Sky Scope* for the nominal price

25

26         [2]  In February 2008, the other five C corporations (Apollo Works Holdings, Inc.; Green
27  Gemini Enterprises, Inc.; North Star Solutions, Inc.; Northern Lights Services, Inc.; and Sunset
    Resources, Inc.) merged into Sky Scope.  Unless otherwise indicated, all references to "Sky
28  Scope" include the five companies that merged into it.

1   of $1.00 a share.  In effect, the structure of Sky Scope ensured Mr. Woodward would retain

2   ownership of TEAM and remain involved in TEAM and its operations while nominally TEAM

3   was owned and operated by others.  Mr. Woodward could resign his official position as TEAM's

4   manager and thereby persuade the Michigan court that he was no longer directing the company,

5   while he continued to own TEAM and participate in TEAM's anti-Quixtar campaign.

6          As the deposition testimony of the former shareholders shows, the original shareholders of

7   Sky Scope, including its president and director, were stand-ins for Mr. Woodward.  They did not

8   pay anything of value to obtain their shares in the company, did not receive any dividends or

9   other compensation as shareholders, and did not receive anything of value when they handed over

10  their shares to Mr. Woodward in February 2008.  Their reward for their participation in Sky

11  Scope was their continued participation as profit sharers within TEAM, Policy Council members,

12  and senior management.  This reward was significant.  As the Michigan court found, Policy

13  Council members earned between $1 million and $10 million annually from TEAM, and the

14  Round Table members were among TEAM's top profit sharers.  (Affidavit of James M. Schurz

15  ("Schurz Aff."), Ex. 1 (Nov. 8, 2007 J. Sullivan Order) at 9.)[3]

16         Collectively, the evidence shows that Sky Scope "reached a unity of purpose or a common

17  design and understanding" with Orrin Woodward, senior managers within TEAM, TEAM Policy

18  Council members, and leading profit sharers to pursue their collective campaign to raid Quixtar's

19  IBOs, disparage Quixtar, and misappropriate Quixtar's trade secrets.  *Gilbrook*, 177 F.3d at 856.

20  The fact that Mr. Woodward abruptly stepped down as manager of TEAM at a time when he

21  needed the company to further TEAM's anti-Quixtar campaign, coupled with proof of Sky

22  Scope's leaders' acquiescence in his instructions and Sky Scope's ability to provide cover, is

23  strong evidence that Sky Scope and its original shareholders agreed to shield Mr. Woodward's

24  involvement in TEAM to enable the parties to evade the Michigan injunction.  Sky Scope's

25  motion for summary judgment should be denied.

26

27
_____

28          [3] The Schurz Affidavit is attached to this brief as Exhibit B.

## II.   STATEMENT OF MATERIAL FACTS WHICH PRECLUDE ENTRY OF SUMMARY JUDGMENT[4]

### A.   TEAM's Leaders Are Terminated as Quixtar IBOs

In 2007, Quixtar approached TEAM's leaders, who at that time were all Quixtar IBOs, to address their serious breaches of the Quixtar Rules of Conduct. (Schurz Aff., Ex. 2 (Declaration of Gary Vander Ven) at ¶ 31.)  Quixtar organized a meeting with TEAM's top leaders on August 9, 2007 to discuss a plan for remediating their misconduct.  (*Id.*)  Instead of working with Quixtar to resolve the issues, TEAM's leaders used the meeting to announce TEAM's intention to break off from Quixtar.  (*Id.*)  This plan had been in development for some time.  They demanded that Quixtar waive the non-compete and non-solicitation provisions in their IBO agreements, making it clear that they intended to solicit thousands of other IBOs to leave Quixtar and join TEAM in working for a competitor.  (*Id.*)  Further, TEAM's leaders threatened that if Quixtar did not forfeit its rights under the IBO agreements, they would immediately launch an all-out legal and public relations campaign against Quixtar.  (*Id.*)

Quixtar did not agree to waive its protections under the agreements and instead terminated the TEAM leaders' IBO contracts.  (*Id.* at ¶ 32.)  Within a few hours, Mr. Woodward and other TEAM leaders filed the class action lawsuit they had threatened, which turned out to be the first in a series of lawsuits by Mr. Woodward's associates targeting Quixtar in state and federal courts all over the country.  (*Id.*; *see also* TEAM, Ex. 30.)  Within days, TEAM's public relations firm unleashed TEAM's multimedia public relations assault on Quixtar, which included unveiling a website entitled "Free The IBO."  (Schurz Aff., Ex. 3 (Declaration of Margaret Ross) at ¶ 3.)  TEAM posted numerous false and disparaging statements about Quixtar on the Free The IBO website in an effort to convince IBO readers to leave Quixtar and join TEAM.  (Schurz Aff., Ex. 4 (excerpt from Free The IBO Website.)

---

[4] A comprehensive statement of facts is included in Quixtar's Opposition to TEAM's Motion for Summary Judgment, filed July 21, 2010, which is incorporated by reference.  The present statement of facts focuses on those facts pertinent to Sky Scope's motion.

**B.   The Michigan Court Enjoins Woodward and Brady from Disparaging Quixtar and Soliciting Its IBOs**

Pursuant to the arbitration provision in its IBO agreements, Quixtar filed a demand for arbitration with JAMS against Mr. Woodward, TEAM's co-founder Chris Brady, and others on August 10, 2007. (Schurz Aff., Ex. 5 (Aug. 24, 2007 J. Sullivan Order) at 2.)  Quixtar also filed a lawsuit seeking injunctive relief in aid of arbitration in Michigan State Court, Kent County, before the Honorable Paul J. Sullivan, *Quixtar Inc. v. Woodward et al.*, No. 07-08413-CK. (*Id.*)

On August 10, Judge Sullivan entered a TRO prohibiting Woodward and Brady from, among other things, "[u]sing their Quixtar Line of Sponsorship ["LOS"] to sell, distribute, or promote competing products"; "[e]ncouraging, soliciting, or otherwise attempting to recruit or persuade any other IBO to compete with Quixtar's business"; and "[d]isparaging Quixtar, or otherwise engaging in activities injurious to the reputation of Quixtar." (Schurz Aff., Ex. 6 (Aug. 10, 2007 J. Sullivan Order) at 2.)  Under the Michigan Rules of Court, the TRO was binding not only upon Woodward and Brady, but also upon "those persons in active concert or participation" with them.  MCR 3.310(C)(4).  Judge Sullivan then set a preliminary injunction hearing for August 22, 2007. (Schurz Aff., Ex. 6, at 3.)  Ultimately, on August 24, 2007, Judge Sullivan converted the TRO into a preliminary injunction (the "Sullivan Order"). (Schurz Aff., Ex. 5.)

**C.   Quixtar Moves to Have Woodward, Brady and TEAM Held in Contempt of the TRO**

Four days after Judge Sullivan entered the August 10, 2007 TRO, Quixtar moved to have Woodward, Brady and TEAM held in contempt for violating it. (Schurz Aff., Ex. 7 (Brief in Support of Ex Parte Motion for Order to Show Cause).)  Quixtar argued that Woodward and Brady controlled TEAM and were using TEAM to violate the TRO. (*Id.* at 6-7.)  Specifically, Quixtar argued that TEAM had posted disparaging statements about Quixtar on the TEAM website and had used Quixtar's confidential and trade secret information to solicit its IBOs. (*Id.* at 4-6.)  Quixtar argued that because the TRO was binding on persons acting in "active concert or

1  participation" with the enjoined parties, TEAM, Woodward, and Brady were all violating the

2  TRO. (*Id.*)[5]

3      **D.**    **Sky Scope Enables the Group to Evade the TRO and Preliminary Injunction**

4      Faced with the threat that the court would find TEAM in contempt of the TRO,

5  Mr. Woodward needed to be able to show that even though he was TEAM's manager, TEAM

6  was not acting "in concert" with him. At the same time, since he was enjoined from carrying out

7  the anti-Quixtar campaign himself, he needed TEAM, its Policy Council and TEAM leaders to

8  move ahead with the group's action plan.

9      Sky Scope was the solution. Sky Scope owned 100% of TEAM. (Schurz Aff., Ex. 8

10  (TEAM's Second Supplemental Answers to Plaintiff's First Interrogatories (Nos. 1, 6, 8(iii)) to

11  Defendant Signature Management TEAM, L.L.C.) at 11-12.) In turn, the people with the ability

12  to control Sky Scope, *i.e.* its president, secretary, treasurer and director, as well as all of its

13  shareholders, were leading profit sharers of TEAM and loyal followers of Mr. Woodward. They

14  included TEAM CEO Bob Dickie, TEAM CFO Rob Hallstrand, and other members of TEAM's

15  Policy Council and Round Table leadership. (*Id.* at 13.) Each of the Sky Scope shareholders had

16  a financial interest in the success of TEAM and the anti-Quixtar campaign. (*See* Schurz Aff.

17  Ex. 9 (D. Freeze Tr. 10/8/08) at 123:14-16 (Freeze was a Policy Council member); Ex. 10

18  (J. Granger Tr. 1/9/09) at 72:13-22 (Round Table member); Ex. 11 (J. Morgan Tr. 1/2/09) at 33:5-

19  10 (Round Table member); Ex. 12 (G. Guzzardo Tr. 12/30/08) at 53:15-20 (Policy Council

20  member); and Ex. 13 (J. McGuire Tr. 3/20/09) at 17:22-18:2 (Round Table Member).) And as

21  shown below in Section IV.B.1, these Woodward loyalists willingly complied with the role they

22  were assigned in shielding Mr. Woodward's interest and participation in Sky Scope and TEAM.

23  (Ex. 9-13.) With the acquiescence of Sky Scope's leaders, Mr. Woodward could dissociate

24  himself from TEAM on paper while retaining his control in TEAM's operations from behind the

25

26

27      [5] Quixtar withdrew its motion for contempt on August 23 and re-filed it a few weeks later, on September 21, 2007. The Michigan court held a three day evidentiary hearing in October and issued its ruling on November 8, 2007. (Schurz Aff., Ex. 1.)

28

1   scenes. Mr. Woodward therefore abruptly resigned his position as TEAM's manager. (Schurz

2   Aff., Ex. 8 at 11.)

3       In October 2007, the Michigan court held a three day hearing on Quixtar's motion to find

4   Woodward, Brady and TEAM in contempt for violating the Sullivan Order. (Schurz Aff., Ex. 1

5   (Nov. 8, 2007 J. Sullivan Order) at 2.) It was at this hearing that Sky Scope's agreement to hide

6   Mr. Woodward's ownership interest in and control over TEAM became a critical factor in the

7   conspiracy: it enabled Mr. Woodward to testify under oath that he was not the owner of TEAM,

8   to claim that he had no legal relationship to the company, and, ultimately, to argue that TEAM

9   was not acting "in concert" with him:

10       Q. Are you still an owner in TEAM?

11       A. No.

12          . . . .

13       Q. You never owned TEAM?

14       A. Hmm-mm.

15       Q. Who did?

16       A. There were — it's an LLC, Signature Management Team is an
          LLC and it's owned by six C-corps.

17

       Q. Do you own those C-corps?

18

19       A. No.

       Q. Who does?

20

21       A. Many different individuals. I really don't — I don't know 'em
          all.

22

       Q. Do you have an ownership in any entity that has an ownership
23          interest in TEAM?

24       A. No.

25       Q. Do you know who does?

26       A. (No verbal response).

27          . . . .

28       Q. What's your current relationship with TEAM?

1     A. *Basically, I don't have any legal relationship.* I do have,
2     obviously, a lot of friends, a lot of relationships that are built over
    the years.

3 (Schurz Aff., Ex. 14 (Tr. Oct. 16, 2007 at 9:13-13:13 (emphasis added)).)  Based on this

4 testimony, and applying the "clear and unequivocal evidence" standard that applies to motions for

5 contempt (*see* Schurz Aff., Ex. 15 (Tr. 10/17/07 at 225:14-19)), the Michigan court found that

6 Mr. Woodward was not a policy maker for TEAM and that there was no violation of the

7 injunction:

8     The Court finds particularly noteworthy the steps that both
    Mr. Orrin Woodward and TEAM took to make a good faith effort
9     to comply with the preliminary injunction.  Following his
    termination from Quixtar and the entry of the order, Mr. Woodward
10     resigned both as a manager of TEAM, as well as being a member of
    the policy council. *These resignations removed Mr. Woodward as*
11     *an authority in a policy-making position for the organization*[.]

12 (Schurz Aff., Ex. 1 at 3 (emphasis added).)

13     In reality, however, Mr. Woodward was never removed as "an authority in a policy-

14 making position" for TEAM at all.  The testimony of Sky Scope's "authorities in a policy-making

15 position" shows that they willingly implemented Mr. Woodward's instructions.  (Schurz Aff.

16 Ex. 9-13.)  They did so because Mr. Woodward held the unrestricted right under the terms of the

17 shareholder agreements to purchase all shares of its stock for a nominal $1.00 per share.  (Schurz

18 Aff., Ex. 16 (stock option agreements).)  Mr. Woodward continued to exert control over TEAM

19 through the agreement he had reached with Sky Scope's and TEAM's leaders.

20 **III.**     **SUMMARY JUDGMENT STANDARD**

21     A court may not grant summary judgment unless the moving party establishes that there is

22 no genuine issue as to any material fact and that the moving party is entitled to judgment as a

23 matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The

24 court must make all justifiable inferences in the light most favorable to the nonmoving party —

25 here, Quixtar.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986).

26 Further, questions involving state of mind, such as whether a person agreed to join a conspiracy,

27 "are generally factual issues inappropriate for resolution by summary judgment."  *Mendocino*

28 *Envtl. Ctr.*, 192 F.3d at 1302 (citing *Braxton-Secret v. Robins Co.*, 769 F.2d 528, 531 (9th Cir.

1   1985)). Even if different inferences might reasonably be drawn from the evidence, this "does not

2   justify judicial intrusion into the jury's role in determining whether a civil conspiracy existed."

3   *Id.* at 1303 (citations omitted). Thus, so long as a finder of fact *could* conclude from the evidence

4   that Sky Scope agreed upon and entered a conspiracy with Woodward, TEAM and the others,

5   summary judgment is not appropriate.

6   **IV.   ARGUMENT**

7        The First Amended Complaint alleges that Sky Scope conspired with TEAM,

8   Mr. Woodward, and others to harm Quixtar, and that Sky Scope is therefore liable for all the

9   harm that the conspiracy caused. Sky Scope fails to address the conspiracy allegations, let alone

10   establish that there is no genuine issue as to any material fact and that it is entitled to judgment as

11   a matter of law. Summary judgment must be denied on that basis alone. In any event, there is

12   strong evidence from which a jury could conclude that Sky Scope participated in the conspiracy.

13   Accordingly, Sky Scope is not entitled to summary judgment.

14        **A.   To Survive Summary Judgment, Quixtar Need Only Show Circumstantial
             Evidence from Which a Jury Could Conclude that Sky Scope Agreed to the
15             Conspiracy**

16        Under Michigan law, an actionable civil conspiracy consists of "an agreement between

17   two or more persons to injure another by unlawful action." *Spadafore v. Gardner*, 330 F.3d 849,

18   854 (6th Cir. 2003) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)).[6] It is not

19   necessary that there be an express agreement among the conspirators, and each conspirator does

20   not need to have known all of the details of the plan or all of the participants. *Id.* Rather, "[a]ll

21   that must be shown is that there was a single plan, that the alleged coconspirator shared in the

22

23        [6] Nevada law is similar in that an actionable civil conspiracy "consists of a combination
     of two or more persons who, by some concerted action, intend to accomplish an unlawful
24   objective for the purpose of harming another, and damage results from the act or acts." *Consol.
     Generator-Nev., Inc. v. Cummins Engine Co.*, 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (1998)
25   (quoting *Hilton Hotels v. Butch Lewis Prods.*, 109 Nev. 1043, 1048, 862 P.2d 1207, 1210 (1993)).
     Further, the plaintiff must demonstrate the existence of "an agreement or meeting of the minds"
26   to accomplish the unlawful act. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d
     1539, 1540-41 (9th Cir. 1989) (en banc) (citation omitted). The plaintiff does *not* need to show
27   that each participant in the conspiracy knew the exact details of the plan, but only that each
     shared the common objective of the conspiracy. *See Mendocino Envtl. Ctr.*, 192 F.3d at 1301.
28

1   general conspiratorial objective, and that an overt act was committed in furtherance of the

2   conspiracy that caused injury to the complainant." *Id.*

3        A civil conspiracy claim may be established by circumstantial evidence. *Temborius v.*

4   *Slatkin*, 157 Mich. App. 587, 599-600, 403 N.W.2d 821, 827-28 (1986).  For summary judgment

5   purposes, "the question whether an agreement exists should not be taken from the jury in a civil

6   conspiracy case so long as there is a possibility that the jury can infer from the circumstances

7   [that the alleged conspirators] had a meeting of the minds and thus reached an understanding to

8   achieve the conspiracy's objectives." *Robinson*, 883 F.2d 75, 1989 WL 94569, at *7 (internal

9   citations omitted).[7]

10       The Complaint alleges that Sky Scope was part of a combination with Woodward, TEAM,

11  and other members of the TEAM Policy Council that used unlawful means to harm Quixtar.

12  (FAC ¶¶ 61, 102-105.)  The evidence shows that (1) at the August 9 meeting, Woodward, Brady

13  and other TEAM leaders asked Quixtar to waive its non-compete and non-solicitation obligations;

14  (2) the Michigan court enjoined Mr. Woodward and those acting in concert with him from

15  soliciting any IBOs; (3) Mr. Woodward abruptly resigned his official position as the manager of

16  TEAM; (4) Sky Scope was the sole owner of TEAM at the time; and (5) as detailed below, Sky

17  Scope's officers and shareholders implemented Mr. Woodward's instructions and objectives and

18  those of the conspiracy.

19       The conspirators memorialized their plan to raid Quixtar's IBOs in a

20  memorandum that laid out a detailed plan for

21

22                                        (Schurz Aff., Ex. 17 (memorandum by

23  ────────────────────────────────

24        [7] The Ninth Circuit has a similar standard - the agreement need not be overt; a
    defendant's knowledge of and participation in the conspiracy may be inferred from circumstantial
    evidence and evidence of its actions.  *Gilbrook*, 177 F.3d at 856-57; *see also Mendocino Envtl.*
25  *Ctr.*, 192 F.3d at 1302 (noting that direct evidence of an agreement "will only rarely be available"
    and that "it will almost always be necessary to infer such agreements from circumstantial
26  evidence or the existence of joint action").  "For example, a showing that the alleged conspirators
    have committed acts that 'are unlikely to have been undertaken without an agreement' may allow
27  a jury to infer the existence of a conspiracy."  *Mendocino Envtl. Ctr.*, 192 F.3d at 1301 (citation
    omitted).
28

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).)[8] The memorandum

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮. It further cautioned: "

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Most

5    importantly (in light of the Sullivan Order), the memorandum warned,

6    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This is

7    exactly what the conspirators did – with the agreement of Sky Scope.

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ shows that Sky

10   Scope's participation was necessary to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11        The evidence is sufficient to preclude summary judgment.  A jury could find from these

12   facts that Sky Scope agreed to join the conspiracy and provided the means through which its co-

13   conspirators continued the anti-Quixtar campaign without triggering a contempt ruling.

14   Mr. Woodward's purported act of abandoning his leadership role in TEAM was illusory and was

15   "unlikely to have been undertaken without an agreement" with Sky Scope and TEAM to

16   implement the objectives of the conspiracy.  *Mendocino Envtl. Ctr.*, 192 F.3d at 1301 (citation

17   omitted).  Thus, even if other inferences could be drawn, summary judgment would not be

18   appropriate here.  *Id.* at 1303.

19        **B.    Sky Scope's Deference to Mr. Woodward's Instructions Is Strong**
**Circumstantial Evidence That Sky Scope Conspired to Shield His**
20        **Involvement in TEAM**

21        The evidence all points to the conclusion that even though the names of Mr. Woodward's

22   friends were on Sky Scope's corporate documents and shares, these nominal shareholders

23   willingly implemented whatever instructions Mr. Woodward gave them with respect to the

24   company.  This, coupled with Mr. Woodward and TEAM's leaders' need to shield

25

26   _____

27        [8] The "▮▮▮▮▮▮▮▮" memorandum is discussed in more detail in Quixtar's
     Opposition to TEAM's Motion for Summary Judgment, filed July 21, 2010.
28

1   Mr. Woodward's involvement in TEAM from the Michigan court, is strong circumstantial

2   evidence that Sky Scope agreed to participate in the conspiracy.

3           **1.    The Testimony of Sky Scope's Officers and Shareholders Establishes
                That They Willingly Complied with Direction from Orrin Woodward
4               and Thus Conspired with Him.**

5               **a.    Testimony of TEAM Round Table Member and Sky Scope
                    "President" Donald Freeze.**
6

7           TEAM Round Table member Donald Freeze was not only a shareholder in Sky Scope but

8   was also, according to the company's corporate documents, its president, secretary, treasurer and

9   director, from the time of its inception in 2003 until February of 2008. (Schurz Aff., Ex. 18

10  (Initial and Annual List of Sky Scope's Officers, Directors and Resident Agent from 2003

11  through 2008).)  Even though he purportedly held every position of control within the company,

12  Mr. Freeze testified that he had no role in Sky Scope's business. (Schurz Aff., Ex. 9 at 267:17-21

13  ("Q. Other than signing the paperwork for the initial incorporation of Sky Scope TEAM, Inc., did

14  you ever personally have any responsibilities, whatsoever, with regard to that entity?  A.  No, I

15  did not.").)  Indeed, he lacked basic knowledge about the company's business operations. (*Id.* at

16  267:25-268:3 ("Q.  And to your knowledge, did Sky Scope Team, Inc. ever do any business other

17  than simply owning part of Signature Management Team, LLC?  A.  I, I don't know.").)  Further,

18  Mr. Freeze testified that his wife served as director of one of the other five companies that

19  merged into Sky Scope, but like Mr. Freeze, she had no substantive role in the company she

20  purportedly directed.  (*Id.* at 268:25-269:11.)  From this testimony it is reasonable to infer that

21  Mr. Freeze and the officers in Sky Scope and the other companies saw their role in the companies

22  as merely a vehicle through which to implement TEAM's objectives.

23          Mr. Freeze also testified about his role as a purported shareholder of Sky Scope.  He

24  stated that the only reason he became a part owner of Sky Scope was that Mr. Woodward asked

25  him to do so:

26              Q. [H]ow did you come to have an indirect ownership stake in
                Signature Management Team, LLC?
27

28

1
    A. Orrin asked me if I would be interested in, you know, representing — just owning one of the, the organizations they were putting together.

2

3
    . . . .

4
    Q. Did Mr. Woodward explain to you why it was he wanted you to form an entity that would own part of Signature Management TEAM, LLC?

5

6
    A. Not specifically. I think — I assumed the general strategy was, you know, like the Kennedys, they don't own anything.

7

8
    . . . .

9
    Q. So he just asked you to do it; he didn't tell you why?

10
    A. Correct.

11
    Q. And you didn't ask him?

12
    A. No.

13
    Q. Did Mr. Woodward offer any incentive or inducement for you to, to do this?

14
    A. No.

15
    Q. Just asked you to do it as a favor?

16
    A. Yes.

17
(*Id.* at 265:6-267:2.) Mr. Freeze then testified that when he was asked to sign paperwork in

18
February 2008 to transfer his shares of Sky Scope to Orrin Woodward, he did not know that he

19
was doing so. Rather, he thought that he and the other directors were resigning their "positions"

20
so as to streamline TEAM's corporate structure. Mr. Freeze, the purported president/director of

21
Sky Scope, simply signed where he was told and did not ask any questions:

22
    Q. [H]ave you ever discussed with anyone that there was going to be a document under which all of these entities that were transferred over to Orrin Woodward on February 1st, 2008, were going to be merged together and end up by owning Signature Management Team, LLC?

23

24

25
    A. I was never told that. I assumed when we signed these, taking these, the last documents to which we referred —

26
    Q. Yeah.

27
    A. —this, that we're not going to be doing this anymore, right?

28

1    Q. Yeah.

2    A. We resigned our positions. I assumed that there was a — you
     know, they were going to streamline the corporate structure of the
3    Team, that's all.

4    (*Id.* at 276:5-20.) Mr. Freeze's testimony establishes that even though he was the official head of

5    Sky Scope, he had no responsibilities in connection with that role, had no knowledge of the

6    company's business (or even if it had any business), thought that he had a position, rather than

7    ownership interest, in the company, and only agreed to sign the paperwork and hold the official

8    titles as a favor to Mr. Woodward. In other words, his entire role in Sky Scope as its president,

9    secretary, treasurer and director, as well as shareholder, was to do what TEAM and

10   Mr. Woodward asked. This is strong circumstantial evidence that Sky Scope had a "meeting of

11   the minds" with Woodward, TEAM, and the others, to further the group's unlawful plans.

12              **b.       Testimony of TEAM Round Table Member Jeff Granger.**

13        TEAM Policy Council member Jeff Granger also testified that his role as a shareholder in

14   Sky Scope and the other corporations was solely to do a favor for Woodward and to further

15   TEAM's objectives. His relationship to the companies was so limited that he did not even know

16   which companies they were:

17        Q. How is it that you didn't know which corporations you owned
          stock in?
18
          **A. We were asked if we would be open to owning some stocks**
19        **in some corporations that Orrin owned. So, I said yeah, no**
          **problem. So they assigned some stock to me.**
20
          Q. Who asked you that?
21
          A. Rob Hallstrand.
22
          Q. Did he say why he was asking you to do that?
23
          A. He — at that point, this was I don't know how many years ago,
24        he had asked if it came from Orrin, you know, and it was — **he just**
          **said it was just a paper thing for some of the corporations that**
25        **he had and he wanted to put people on there that he trusted**
          **and asked if I would do it. So I did.**
26

27   (Schurz Aff., Ex. 10 at 274:12-275:7 (emphasis added).) Mr. Granger further testified that he did

28   not pay any money to acquire the stock (*id.* at 275:10-13), and that he did not receive any

PLAINTIFF'S OPPOSITION TO DEFENDANT SKY SCOPE'S MOTION FOR SUMMARY JUDGMENT             14
Case No. 3:07-cv-00505
sf-2861878

1    payment of any kind in connection with his ownership of the stock, either in the form of a

2    dividend when he was a shareholder or upon transferring the stock to Mr. Woodward in February

3    2008 (*id.* at 276:2-10 and 276:18-277:4 ("I was like, yeah, no problem.  Let me get my name off

4    of there.  I don't care.  Didn't matter to me, anyway. . . . I couldn't have told you if it was one or

5    six or 20 [corporations].  I mean, there was multiple things that I signed.  I don't know what the

6    names even were on them.").)  Finally, Mr. Granger testified that he had no role in the company:

> Q.  When you owned the stock, were you — did you have any
> responsibilities with regard to this company?
>
> A.  None whatsoever.

10    (*Id.* at 276:5-7.)  In short, Mr. Granger's testimony confirms that he, and inferentially, the other

11   shareholders in Sky Scope, were owners in name only, and that ultimately decision-making rested

12   with Mr. Woodward.

           **c.**     **Testimony of TEAM Round Table Member John Morgan.**

      TEAM Round Table member John Morgan testified that beyond not having any role as a

15   purported owner of Sky Scope, he did not even know that he *was* an owner of Sky Scope and,

16   through it, TEAM:

> Q.  Did you know that you were an owner of six Nevada
> corporations who owned TEAM?
>
> A.  No, I guess I didn't know that.
>
> Q.  Did you know that you had some sort of ownership interest in
> TEAM?
>
> A.  No.  I knew I had an officer — at least that's what I understood,
> I was an officer, but I didn't know I had any ownership in it.
>
> [ ]
>
> Q.  Until I showed this to you today did you know that you were an
> owner of TEAM?
>
> A.  No.
>
> . . . .
>
> Q.  You held a very significant share of the entire TEAM
> organization.

1           A.  Huh.

2   (Schurz Aff., Ex. 11 at 139:24-144:8.)  It is unsurprising, then, that Mr. Morgan also testified that

3   he did not pay anything for his shares or receive anything when he returned his shares.  (*Id.* at

4   146:19-147:4.)  Mr. Morgan further testified that when he signed papers giving away his interest

5   in Sky Scope, he was not aware that he was doing so.  (*Id.* at 143:18-144:8.)  Finally, Mr. Morgan

6   testified that his sole role in the six corporations was to serve as Mr. Woodward's "good friend":

7           Q.  Other than signing papers that Mr. Hallstrand sent you, did you
                 perform any other duties in connection with your either ownership
8                 or officer role in any of these companies?

9           A.  No.

10          Q.  And other than what you've testified to with respect to what
                 Mr. Woodward told you, did anyone ever explain to you the
11                purpose of these corporations?

12          A.  No.

13          . . . .

14          Q.  Did Mr. Woodward indicate in any way why he had selected
                 you as someone to be involved in the Nevada corporations among
15                the many, many other people on TEAM?

16          A.  Just that he trusted me, good friend.

17   (*Id.* at 146:4-147:16.)  Mr. Morgan's testimony is further circumstantial evidence that the

18   shareholders of Sky Scope and the other entities acted in concert with Mr. Woodward and thus

19   conspired with him.

20             **d.**      **Testimony of TEAM Policy Council Member George**
                      **Guzzardo**
21

22        Mr. Guzzardo similarly testified that he had never heard of Sky Scope or any of the five

   companies that merged into it.  (Schurz Aff., Ex. 12 at 212:8-213:2.)  Mr. Guzzardo then testified
23

24   that he did not know that he had ever owned TEAM, and he did not know if he presently had any

   ownership of that company or of Sky Scope:
25

26          Q.  Do you have an ownership interest in TEAM?

27          A.  I just know there's a possibility I might have some.

28          . . . .

1    Q. Were you aware at least as of October 8, 2007 that you were an
     owner of a corporation that owned TEAM?
2    A. No.

3    . . . .

4    Q. So is this the first time you're hearing about that you — you
     own stock in companies that own TEAM?
5
     A. Yeh.
6
     . . . .
7
     Q. Do you know whether you still own TEAM, or you know, own
8    a por — a portion of TEAM?

9    A. No.  Yeh, no.  I don't know.

10   . . . .

11   Q. Are you a shareholder [in Sky Scope TEAM]?  Do you own part
     of it?
12
     A. Yeh, no.  I have no idea.  I've never — I can't say that I know.
13
     Q. Well, do you know whose decision it was to make you a
14   stockholder in these six corporations?

15   A. No.

16   Q. It wasn't you, I take it, since you didn't hear about it till today.

17   A. Well, I mean, you know, who knows?  I mean, you sign papers
     and you don't pay attention to stuff, but no I was never aware of it.
18

19   (*Id.* at 212:3-216:24.)  Mr. Guzzardo also could not identify any compensation he ever received

20   as a stockholder of TEAM.  *Id.* at 215:13-19.  Again, this testimony provides strong

21   circumstantial evidence that the owners of Sky Scope willingly complied with whatever

22   instructions or plans Mr. Woodward dictated, and that their acquiescence was in furtherance of

23   the conspiracy.

24              e.       **Testimony of TEAM Round Table Member Joseph McGuire.**

25        TEAM Round Table member Joseph McGuire provided still more testimony showing that

26   Sky Scope's shareholders agreed to and followed Mr. Woodward's instructions with respect to

27   that company.  Mr. McGuire first learned that he had been a stockholder in Sky Scope and the

28   other entities at his deposition.  (Schurz Aff., Ex. 13 at 16:2-21.)  Mr. McGuire further testified as

1    to his lack of knowledge about the nature of the companies in which he was a stockholder, his
2    role in them, and what exactly he owned:

3            Q. What did you know concerning the nature of these companies,
             what they did and what your role in them was?
4
5            A. I didn't know much of anything.

6            . . . .

7            Q. What did you know about the nature of what you owned?

8                    Mr. Spaeth: Objection as to form.  You can answer.

9            Q. You can answer.

10           A. I didn't know much of anything.

11   (*Id.* at 26:17-20 and 35:13-18.)  Finally, Mr. McGuire testified that he did not recall receiving any
12   compensation from Orrin Woodward for turning over his shares.  (*Id.* at 34:16-20.)
13          In short, the testimony from the officers and shareholders of Sky Scope establishes that
14   the leaders of Sky Scope willingly agreed to implement the instructions and objectives of
15   Mr. Woodward and TEAM.  A jury could readily conclude that Sky Scope therefore conspired
16   with Mr. Woodward, TEAM, and TEAM leaders in furthering the anti-Quixtar campaign.
17   Indeed, the ability and opportunity to conspire provides circumstantial evidence of participation
18   in a conspiracy. *See Temborius*, 157 Mich. App. at 599-600, 403 N.W.2d 821, 827-28; *see also*
19   *Mendocino Envtl. Ctr.*, 192 F.3d at 1303 n.34.  The evidence here goes far beyond that and
20   supports a finding of conspiracy.

21           **2.      Mr. Woodward's Unrestricted Stock Options in Sky Scope Constitute**
                        **an Ownership Interest.**
22

23          Even though his loyal followers were installed as the unwitting "owners" and "officers" of
24   Sky Scope, Mr. Woodward made certain that Sky Scope and TEAM continued in their anti-
25   Quixtar quest by retaining the unrestricted option to purchase the entirety of each shareholder's
26   shares at any time, effective as of the date the stock was issued.  (Schurz Aff., Ex. 16.)  This right
27   came at the nominal purchase price of $1 per share.  (*Id.*)  Since each of the eleven shareholders
28   owned thirty shares in each of the six companies, Mr. Woodward could acquire any shareholder's

1   interest for only $180, and the entire company for less than $2000. This ensured that

2   Mr. Woodward would continue to influence the direction of the companies, no matter whose

3   name appeared as an officer or shareholder on the corporate documents.

4        The options proved useful. On the eve of the preliminary injunction's expiration, in early

5   February 2008, when Mr. Woodward and those acting in concert with him would no longer be

6   prohibited by court order from disparaging Quixtar and soliciting its IBOs, *Mr. Woodward*

7   *exercised his options, acquired all outstanding shares of the six corporations that owned TEAM,*

8   *and merged them into Sky Scope.* (Schurz Aff., Ex. 19 (Plan of Merger); Ex. 20 (shareholder

9   certificates surrendering all right, title and interest in the shares).)[9] Mr. Woodward's ability to

10  step in at any time and assume control of the companies from the shareholders further

11  demonstrates Sky Scope's willing compliance with the campaign being orchestrated by

12  Mr. Woodward, TEAM, and TEAM leaders and provides further circumstantial evidence of Sky

13  Scope's participation in the conspiracy.

14       In short, the evidence shows that Sky Scope conspired with Mr. Woodward to create the

15  appearance of distance between himself, TEAM and the TEAM leaders, in order to save himself

16  and TEAM from being held in contempt and thereby further TEAM's tortious interference and

17  Lanham Act violations. A jury could conclude on this evidence that through this course of

18  events, Sky Scope provided the means by which the group's anti-Quixtar campaign could

19  continue despite the Sullivan Order. These factual issues defeat summary judgment.

20  **V.   CONCLUSION**

21       The evidence establishes that Sky Scope, TEAM and TEAM leaders, in combination with

22  Orrin Woodward, "reached a unity of purpose or a common design and understanding" to raid

23  Quixtar's IBOs, misappropriate Quixtar's trade secrets, and disparage Quixtar during a period

24  when Mr. Woodward was enjoined from taking any actions in connection with TEAM. *In re Nw.*

25

26       [9] Tellingly, even though Mr. Woodward's options entitled him to acquire the outstanding
    shares of Sky Scope at $1 apiece, the shareholders testified that they handed over their entire
27  interest in the company for nothing. Mr. Woodward acquired the entire company without ever
    paying a dime. (Schurz Aff., Ex. 10 at 276:2-4; Ex. 11 at 146:19-22; Ex. 13 at 33:15-34:20.)
28

1   *Airlines Corp.*, 208 F.R.D. at 199 (evaluating antitrust conspiracy claim). For all the foregoing

2   reasons, Sky Scope's motion for summary judgment must be denied.

3

4   Dated: July 21, 2010                                    /s/ Miranda Du
                                                          JOHN FRANKOVICH
5                                                         MIRANDA DU
                                                          MCDONALD CARANO WILSON LLP
6                                                         100 W. Liberty Street, 10th Floor
                                                          P.O. Box 2670
7                                                         Reno, NV 89505-2670

8                                                         CEDRIC C. CHAO
                                                          WILLIAM L. STERN
9                                                         JAMES M. SCHURZ
                                                          MORRISON & FOERSTER LLP
10                                                        425 Market Street
                                                          San Francisco, California  94105-2482
11
                                                          JAMES SOBIERAJ (IL SBN 6183779)
12                                                        DOMINIC P. ZANFARDINO (IL SBN 6204603)
                                                          BRINKS HOFER GILSON & LIONE
13                                                        NBC Tower, Suite 3600 North Cityfront Plaza Drive
                                                          Chicago, IL 60611-5599
14                                                        Telephone:  (312) 321-4226
                                                          E-Mail: jsobieraj@usebrinks.com
15                                                        and dzanfardino@usebrinks.com

16                                                        BRADLEY SMITH (BN 52,230)
                                                          BRINKS HOFER GILSON & LIONE
17                                                        524 South Main Street, Suite 200
                                                          Ann Arbor, MI 48104-2921
18                                                        Telephone:  (734) 302-6032
                                                          E-Mail:  bsmith@usebrinks.com
19
                                                          EDWARD J. BARDELLI  (MI SBN P53849)
20                                                        BRIAN J. MASTERNAK (MI SBN P57372)
                                                          WARNER NORCROSS & JUDD LLP
21                                                        900 Fifth Third Center, 111 Lyon Street, NW
                                                          Grand Rapids, MI 49503
22                                                        E-Mail:  EBardelli@wnj.com
                                                              and BMasternak@wnj.com
23
                                                          Attorneys for Plaintiff Quixtar Inc.
24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury, that I am an employee of McDonald Carano Wilson [LLP] and that pursuant to LR 5-3 I caused to be electronically filed on this date, a true and correct copy of Plaintiff Quixtar Inc.'s Opposition to Defendant Sky Scope Team, Inc.'s Motion for Summary Judgment with the Clerk of the Court using CM/ECF System, which will automatically e-serve the same on the attorneys of record set forth below.

Sharon M. Woods, *swoods@bsdd.com*
Morley Witus, *mwitus@bsdd.com*
Daniel LaCombe, *dlacombe@bsdd.com*
Barris, Sott, Denn & Driker, P.L.L.C.
211 West Fort Street, 15th Floor
Detroit, MI 48226-3281

John Desmond, *jpd@jonesvargas.com*
JONES VARGAS
100 W. Liberty St., 12th Floor,
PO Box 281
Reno, NV 89504

Dated: July 21, 2010

*/s/ Kathleen E. Ryd*
Kathleen E. Ryd